IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| TOMMIE SHERMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 1:16-cv-939-WKW-WC |
| | ) | |
| ROBERT M. SPEER, Acting | ) | |
| Secretary, Department of the Army, | ) | |
| | ) | |
| Defendant. | ) | |

## RECOMMENDATION OF MAGISTRATE JUDGE

### I.  INTRODUCTION

Before the court is Defendant's Motion for Summary Judgment (Doc. 42). Plaintiff has filed a Response (Doc. 45) and Defendant has filed a Reply (Doc. 47). The District Judge has referred this matter to the undersigned United States Magistrate Judge for consideration and disposition or recommendation on all pretrial matters as may be appropriate. (Doc. 18.)   Defendant's motion is fully briefed and is ripe for recommendation to the United States District Judge.   For the reasons below, the undersigned RECOMMENDS that Defendant's Motion for Summary Judgment (Doc. 42) be GRANTED.

### II.  STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court shall grant a motion for "summary judgment if the movant shows that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Only disputes about material facts will preclude the granting of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Vehicleriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson*, 477 U.S. at 248).

Under Rule 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Id.* at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present

evidence in support of some element of his case on which he bears the ultimate burden of proof. *Id.* at 322–23.

Once the movant has satisfied this burden, the nonmoving party must "go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. In doing so, and to avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[], admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

If the nonmovant "fails to properly address another party's assertion of fact" as required by Rule 56(c), then the court may "consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2) & (3).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the nonmovant. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003). Likewise, the reviewing court must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam). Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990); *see also Anderson*, 477 U.S. at 249-50 ("If the evidence [on which the nonmoving party relies] is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted).

### III.  STATEMENT OF UNDISPUTED FACTS

In the court's Order setting guidelines for filing dispositive motions, the parties were directed to confer and agree upon the facts that are uncontested and were further advised that the court would rely upon the parties' representations in its determination of whether there is a genuine issue of material fact. (Doc. 30, ¶ 5.) Defendant presented a detailed statement of undisputed facts. Due to Plaintiff's counsel's scheduled travel plans, the parties were unable to confer and agree upon

the uncontested facts before Defendant filed its Motion for Summary Judgment. *See* Doc. 43, p. 3. However, in his response, Plaintiff identified five individual facts from Defendant's Undisputed Material Facts that he asserts are in dispute. (Doc. 45, pp. 1-7.) After a thorough review of the parties' briefs and evidentiary materials, the undersigned finds that, with the exception of two of the five facts that Plaintiff asserts are in dispute, Defendant's Statement of Undisputed Materials Facts is due to be adopted. Defendant's facts, edited for inclusion of only those facts material to the undersigned's recommendations and to reflect the facts disputed by Plaintiff, are set forth below:

## A.   Background Facts – Security at Fort Rucker

1.    On December 17, 2012, Tommie Sherman (born 1954) began employment as a Security Guard with the Fort Rucker Directorate of Emergency Services, Police/Provost Marshall Division.

2.    Sherman's first level supervisor was Lieutenant Gary Allen, Supervisory Security Guard. His second-level supervisor was David Lawson, Deputy Chief of Security Guards. His third level supervisor was Mr. Marvin Brandon, Chief of Security Guards.

3.    Fort Rucker is authorized to have security personnel to cover five gates: Daleville, Ozark, Enterprise, Shell, and Cairnes. The number of authorized security guard positions is based on traffic-flow analysis. Fort Rucker has two additional gates – Faulkner and Newton – which are known as "command" or "convenience" gates and for which it is not allocated additional guards. The Base Commander decides how long and for what hours security personnel man these convenience gates. When Faulkner and Newton are open, they are added to the security guard team rotation. The three main gates (Daleville, Enterprise, and Ozark) are open 24-hours a day and have two 12-hour shifts. Newton and Faulkner were 16-hour shifts running on two 8-hour shifts Monday through Friday when Sherman was employed at Fort Rucker. Newton is now a 5-hour gate.

4.      Security at Fort Rucker must comply with Army Regulation 525-13, relating to random anti-terrorism measures. The purpose of the program is to ensure that terrorists cannot easily discern security patterns or routines and find a way to infiltrate facilities. This regulation provides that Random Antiterrorism Measures ("RAM") must be "conducted as an integral part of all AT programs. RAM is particularly important for our units, installations, [and] facilities … due to the static nature of our forces, and missions often result in the establishment of identifiable routines." The regulation directs that "Commanders will employ RAM … in a manner that portrays a robust, highly visible, and unpredictable security posture from which terrorists cannot easily discern security AT patterns or routines." Furthermore, the regulation directs that "[t]o maximize effectiveness and deterrence value, commanders should implement RAM without set pattern, either in terms of measures selected, time, place, or other variables."

5.      Security guards at Fort Rucker are assigned to teams reporting directly to a lieutenant, and the teams rotate between the gates every few months. In addition to rotating among the gates, guards also rotate shifts. Guards would work a schedule where they may work three days, be off four days, work two days, be off three days, and work two days. Guards had to be able to work 8 hour shifts, 12 hour shifts, day shifts, and night shifts. The 12-hour shifts were actually 13 hours because the guards had to get ready before the shift and debrief at the end of the shift. There are no guards permanently assigned to just one gate and one shift.[1]

6.      Security Guards at Fort Rucker have no set or scheduled meal times during their shifts. Security guards are not given unpaid lunches or breaks. They provide security during their entire shift. Guards are expected to eat when the gate traffic and operational tempo permits them to do so. Guards are also instructed to eat out of the public view.

## B.      Fort Rucker Security Guard Conditions of Employment Duties

7.      At Fort Rucker, one aspect of RAM is random vehicle inspections conducted by a guard who goes from gate to gate to perform inspections without any given schedule. This RAM patrol was not a permanent position assigned to any one

---

[1] Plaintiff asserts that the last sentence of Paragraph 5 is disputed because Greg Jackson, a civilian security guard, works on a limited schedule and has been permanently assigned to third shift as a reasonable accommodation for problems with his feet. Doc. 45 at p. 2.  However, evidentiary citations by Plaintiff demonstrate that, while Mr. Jackson is permanently assigned to third shift, he is not assigned to one gate. Instead, he rotates 12-hour shifts from gate to gate like the other security guards. Accordingly, he is not assigned to one gate and one shift, and this fact is undisputed.

security guard but instead security guards rotated through it as part of their security guard duties.

8.    Army Regulation 190-56, The Army and Civilian Police and Security Program, is a regulation setting forth policies and procedures relating to civilian security guards. It states that all applicants are required to sign a condition of employment statement. In this statement, they must agree to initial and periodic medical evaluations to assess their ability to take a physical agility test ("PAT") and to perform the essential functions of their security guard positions. They must also agree, among other things, that they have to be able to pass a periodic medical exam and be able to "work shifts, overtime, and weekends, as required."

9.    Conditions of employment listed in Plaintiff's Position Description include shift work, possible change of shift, fluctuating hours of work, overtime as directed, and recall for periods of emergency overtime. The conditions of employment also included periodic medical exams of physical, emotional, and mental stability, entry level and annual recertification of standard Army physical fitness/agility test, and sufficient physical condition to conduct or assist in searching vehicles and persons and restraining persons. The Position Description further provided that "[l]ong periods of standing, walking and/or agility, dexterity, and strength to pursue and detain uncooperative persons are required."

10.    In April 2015, a new Position Description for Security Guards was issued because guards began performing National Crime Information Center (NCIC) checks at the Visitor Control Center (VCC) as part of their regular duties. In the new Position Description, Security gate guard duties encompassed 50% of the major duties and VCC duties encompassed 50% of the security guard major duties. The revised Security Guard position description retained the requirement that "[l]ong periods of standing, walking and/or agility, dexterity, and strength to pursue and detain uncooperative persons are required." It also retained all the Conditions of Employment from the prior Position Description. This revised position description was part of a process that began when an operations order was issued to all military installations regarding NCIC checks.

11.    After NCIC duties were added to the duties of security guards, those security guards with the required NCIC training and access codes rotated between working the NCIC terminal at a VCC and other security guard duties. This meant that security guards continued to rotate shifts and had to work both 8-hour and 12-hour shifts. The NCIC duties were part of the security guard duties. There was no separate and permanent NCIC position within the visitor control centers for security guards.

## C.     Fort Rucker Security Guard Medical Exams and Standards

12.    Dr. Richard Gilbert, Preventative Medicine Service Physician, was the Occupational Medicine Doctor at Fort Rucker from 2009 until June 2017.

13.    As part of his job, Dr. Gilbert performed a pre-employment examination of Sherman. Sherman revealed to Dr. Gilbert that he had been diagnosed with Type II diabetes and that he controlled it with insulin. Sherman also indicated that he had been a security guard while working for other employers while he had this Type II diabetes.

14.    One of the sections in Army Regulation 190-56 relating to medical exams states that "Diabetes Mellitus could interfere with the performance of essential police and guard functions. Consultation with the attending physician, RMC OM [Regional Medical Command Occupational Medicine] physician, or PHC [Public Health Command] OMC physician is recommended. The examinee's blood glucose should have been under excellent control for an extended period of time and glycosylated hemoglobin should be less than 8.0. The examinee should have … no end organ damage (nephropathy, neuropathy….)." A1C levels generally provide a three to four month picture of a diabetic's blood sugar levels. A diabetic with poorly managed diabetes as shown by high A1C levels has a greater danger of dehydration, which can decrease mental abilities and reduce ability to respond. Pursuant to Army Regulation 1900-56, a security guard had to "maintain mental alertness" and was required to "have the functional ability to respond appropriately to routine and emergency situations" in order to perform the essential security guard duties.

15.    Dr. Gilbert tested Sherman's A1C levels as part of his initial examination. Sherman's A1C when he was hired was 8.4. Dr. Gilbert wrote on his medical notes that – "while his diabetes could be better controlled at present he has been living with this disease for years with close medical follow-up and no physical or lab findings of advanced disease….will follow-up with quarterly HbA1c if hired." Dr. Gilbert further explained that he had spoken with Sherman, who indicated he understood his diabetes and was seeing a physician, and he wanted to give Sherman the chance to bring his blood sugar levels below 8.0.

16.    Sherman's A1C level was tested on February 7, 2013, and it was 7.6. Dr. Gilbert wrote in his medical records that "diabetes is within security guard standards, needs to keep it under 8."

**D.    The First Time Dr. Gilbert Found Sherman Temporarily Medically Unqualified**

17.    On September 11, 2013, Sherman had his blood tested at Dr. Gilbert's office and his A1C level was 9.2. Sherman had his blood tested again on September 24, 2013, and his A1C was 9.1.

18.    When Dr. Gilbert met with Plaintiff on September 24, 2013, Dr. Gilbert found Sherman temporarily medically unqualified to perform the essential job functions for a security guard, including carrying a weapon and standing gate guard duty, because his A1C level exceeded the standards set by Army Regulation 190-56. Other essential functions that Dr. Gilbert found that Sherman could not perform included the six general essential functions in Army Regulation 190-56, including the ability to drag, carry, lift, and/or pull a person to safety; use physical force to detain a subject or prevent unauthorized entry; prolonged standing and/or sustained patrol on foot or in a vehicle; sustained pursuit of suspect on foot; dodging, crawling, climbing, and/or rapid ascent of stairs; and the ability to perform all the above tasks while wearing duty equipment and/or protective gear. Dr. Gilbert wrote in his medical records "DAC security guard not fit at this time to perform gate guard duties or carry a weapon. Hemoglobin A1c is above 8. Will not be allowed to resume these duties until that time … Expect up to 3 months before he will be fit for duty."

19.    Dr. Gilbert submitted a memorandum to Chief Brandon advising him that Sherman was temporarily unable to perform essential functions of his job and stating that a return to full duty could take up to 90 days.

20.    Chief Brandon then removed Sherman from gate guard duties and temporarily assigned him to administrative/light duty work. Fort Rucker does not have a separate administrative or light duty position for security guards. While on this temporary assignment, Sherman performed whatever work was needed at the time. This included helping train new guards, running errands, and getting supplies. He did not work shifts, and he did not stand gate guard duty. The hours of the administrative duties assignment were 07:30 to 16:15, including a 45 minute uncompensated lunch break. Sherman remained on light duty until January 3, 2014.

**E.    Sherman Returned to Full Duty in January 2014**

21.    On January 3, 2014, Dr. Gilbert saw Sherman again and cleared him to return to full duty. Dr. Gilbert wrote in his file that Plaintiff "has been unable to perform the essential duties of a security guard, determined by me, since Sept. 2013 because of a Hemoglobin A1C greater than 8. He has been performing non-gate

guard duties without carrying a weapon since" and that "he is now below 8 and is here upon my request to return to full duty." Dr. Gilbert further wrote that, "[u]pon further discussion with him, it appears that what truly aided him in getting his A1c below 8 was a regular work day eat, sleep, and exercise properly. I am very familiar with the security guard schedules and shift changes here on the Post. I concur that due to his age and his insulin dependence that staying on one regular shift, as opposed to several weeks of 12 hour shifts a night then back to days, etc., is a requirement for him to keep his diabetes well managed."

22.    In the memorandum returning Sherman to full duty, Dr. Gilbert opined that, in order for Sherman to continue to perform the essential functions of his position, he could only work up to 12 hours in a 24-hour period and the hours must be consistent and regular, including scheduled meal times with only occasional variance up to an hour.

23.    On March 14, 2014, as part of his annual physical bloodwork, Sherman had his A1C level tested and it was 8.3.

## F.    The Second Time Dr. Gilbert Found Sherman Temporarily Medically Unqualified

24.    On March 28, 2014, Dr. Gilbert again found Sherman medically unqualified to perform the essential functions of the security guard position because his A1C levels had gone above eight as indicated by the March 14th test results. Dr. Gilbert wrote in his notes "DAC security guard is again unfit to perform the essential functions of a security guard." Dr. Gilbert had another blood test run on Sherman on March 28, 2014, but he did not see the results that day.

25.    On March 31, 2014, Sherman submitted a formal request for reassignment as an accommodation because he could not carry a weapon or stand gate guard duty because of AR 190-56. Upon receipt of the request, April Morning, in her position of Human Resources Specialist, made a preliminary search for available reassignment positions for which Sherman was qualified, found no available positions for which he was qualified, and discussed the results with Sherman.

## G.    Sherman Returned to Full Duty in April 2014

26.    On April 17, 2014, Sherman's A1C level was tested, and it was 7.7.

27.    Sherman filed a notice withdrawing his Reasonable Accommodation request on April 17, 2014.

28.     On April 18, 2014, Dr. Gilbert cleared Sherman to return to full duty based on his lab results, and Chief Brandon returned Sherman to full duty.

29.     Around the time period while he worked as a security guard, the only treating physician Sherman saw regarding his diabetes was Dr. Parwaiz, a general practitioner who worked at a walk-in clinic called StatMed. Sherman had been using doctors at StatMed for approximately 20 years, and he went there on average of once or twice a year.

## H.     Sherman's General Practitioner Blood Tests Show AIC Levels Exceed Eight

30.     In June 2014, Sherman had his blood tested at StatMed, and went to see Dr. Parwaiz for follow-up. His medical notes revealed that he had run out of Kombiglyze, a diabetes medication he was taking at the time, and that he was not taking his medication as told. His A1C level was 8.4. He listed his reasons for seeing the doctor as "high AIC." Sherman did not notify management or Dr. Gilbert of these results.

31.     On July 17, 2014, Sherman saw Dr. Parwaiz at StatMed again. Sherman's A1C level at the time was 9.4. Dr. Parwaiz's office gave Sherman a number of handouts regarding diabetes and diabetes management. One of the handouts was entitled "Your Diabetic Diet Guidelines," and it stated "Do not skip meals. Eat each meal at the same time every day. Eat each snack at the same time every day. Be very consistent about the amount of carbohydrates you eat." Sherman did not notify management or Dr. Gilbert of these results.

32.     Dr. Gilbert had Sherman's A1C level tested on December 2, 2014, and the result was 9.6.

## I.     The Third Time Dr. Gilbert Found Sherman Medically Unqualified

33.     Dr. Gilbert had Sherman's A1C level tested on January 9, 2015, and the result was 9.3. Sherman's A1C was also tested by Dr. Parwaiz's at StatMed, and found to be 8.9 on January 27, 2015. Sherman did not notify management or Dr. Gilbert of these results from Dr. Parwaiz's office.

34.     On March 19, 2015, Sherman had his blood tested for his annual physical exam with Dr. Gilbert. Sherman's A1C was 8.8.

35.     On April 10, 2015, during Sherman's annual medical examination, Dr. Gilbert found that Sherman was again temporarily medically unqualified to safely

stand gate guard duty and carry a weapon based on his A1C levels again being above the standards set by Army Regulation 190-56. Dr. Gilbert determined that Sherman should only perform the physical fitness activities at his own pace, but he could perform other duties of his job description, including office work, on a regular eight-hour day. Dr. Gilbert stated he would reevaluate Sherman on a monthly to bi-weekly basis and would make a final determination as to his fitness to continue in his position as soon as possible. Dr. Gilbert also noted that Sherman's medical condition was unstable and that it may have reached the point where he would not be able to be found fit to return to full duty. Dr. Gilbert added this last observation because every time he returned Sherman to full duty, his blood sugars got out of control again and went beyond that allowed by the regulations.

36.    On April 14, 2015, Chief Brandon again assigned Sherman to an administrative work week because he was temporarily unable to perform the essential functions of the security guard job. Sherman's duty hours were 07:30 AM to 16:15 PM, with a 45-minute unpaid lunch break. During this time, Sherman performed whatever administrative work needed to be accomplished.

## J.    The 2015 Reasonable Accommodation Request

37.    On June 8, 2015, Sherman submitted a request for reasonable accommodation for reassignment to the NCIC Check at the main gates, stating he was no longer able to stand for prolonged periods "d[ue] to [his] chronic [health] condition[.]" Sherman came up with the "no standing" restriction himself, because his legs became uncomfortable with prolonged standing due to his neuropathy, and he never discussed it with any treating physician.[2]

38.    When an employee files for a reasonable accommodation, the Equal Employment Office ("EEO") sends Dr. Gilbert, as the occupational health physician, a copy of the request. Dr. Gilbert reviews the medical records from the employee and determines if he or she has a disability that will prevent him or her from performing the essential functions of the job. Dr. Gilbert then provides an opinion to a reasonable accommodation committee as to what accommodations the employee needs in order to be able to do his or her job with his or her medical disability.

39.    On June 24, 2015, Dr. Gilbert saw Sherman in relation to the reasonable accommodation request. He wrote in his medical notes "[S]ecurity guard well known to me. He has been on no gate guard duty or carrying a weapon for a couple of

_____

[2] Plaintiff disputes that he came up with the "no standing" restriction, but he has cited no evidentiary materials showing that this fact is disputed. Further, Plaintiff testified during his deposition that he came up with this restriction on his own. Pl. Dep. 119:1-12.

months now secondary to poorly controlled diabetes. He has placed a formal request through the EO office to be transferred to a full time NCIC duty and that he can no longer perform duties that require prolonged standing. I told him I would review all his medical records from his providers and then provide a recommendation for reasonable accommodation through the EO office."

40.    Dr. Gilbert received Sherman's request for a reasonable accommodation, any records Sherman provided, and medical records from Sherman's general practitioner (StatMed), his nephrologist, and his cardiologist. Dr. Gilbert prepared a memorandum detailing the accommodation that he thought would benefit Sherman and enable him to do the job and maintain his health. Dr. Gilbert cannot make a recommendation that an employee work in a particular position since that determination is for a supervisor. Dr. Gilbert believed, based on dealing with Sherman for the prior year and a half, that Sherman needed a permanent regular and consistent schedule in terms of hours, shift, and meals, in order to do his job and maintain his health.

41.    On July 14, 2015, Dr. Gilbert issued his memorandum to the reasonable accommodation committee containing his recommendation that, in order for Sherman to perform the essential duties of his position, his work schedule must be consistent and regular. Sherman could only stand 8 hours guard duty in a 24-hour period, with consistent shift start and end times, no shift work, and regularly scheduled meal times with minimal variation.

42.    On August 12, 2015, the Fort Rucker Reasonable Accommodation Committee ("RAC") met to discuss Sherman's request for a reasonable accommodation and Dr. Gilbert's recommendation. The RAC was composed of April Morning, Chief Brandon from management, Dr. Gilbert, an EEO representative, and a legal representative. Chief Brandon, as a supervisor, was the ultimate decision-maker as to whether accommodation was possible, and the other members gave him information to assist in the decision-making process.

43.    Dr. Gilbert advised the RAC that Sherman required a regular and consistent schedule, including a regularly scheduled mealtime every day. Chief Brandon asked Dr. Gilbert if he was saying that Sherman needed to eat at the same time every day, and Dr. Gilbert responded "yes." Dr. Gilbert was also asked if Sherman could just eat some almonds instead of sitting down for a meal, and Dr. Gilbert responded that it absolutely had to be a set meal period every day.

44.    After discussion, the decision was made that Sherman could not be accommodated in his current position because the security guard position did not

allow for a scheduled meal at the same time every day.[3] The RAC recommended that due to Sherman's limitations as outlined by Dr. Gilbert, reassignment to another position should be considered.

45.    Ms. Morning searched for available positions for which Sherman was qualified but did not identify any available positions at Fort Rucker. Sherman elected that she not search for positions in other geographical locations.

46.    On September 14, 2015, Chief Brandon denied in writing Sherman's June 8, 2015, reasonable accommodation request. Chief Brandon explained in the memorandum that security guards could only take breaks and meal periods as determined by the operational tempo of traffic at their locations. The memorandum stated that, because the Army was unable to commit to a scheduled meal time, it could not accommodate Sherman's medical limitations. The memorandum also explained that reassignment was also explored as a method of accommodation but that there were no vacant positions on the installation for which Sherman was qualified.

47.    Sherman did not challenge or respond to Dr. Gilbert's requirement that he have scheduled meals at the same time every day.

## K.    Sherman's Termination

48.    On September 21, 2015, Sherman applied for disability insurance benefits. In his application, he stated that he "became unable to work because of my disabling condition on July 14, 2015" and that "I am still disabled."

49.    On September 28, 2015, Plaintiff's first level supervisor, Lieutenant Allen, signed a proposed removal of Sherman based on the Army's inability to accommodate him in his current position and the inability to identify another available position for which he was qualified. The notice advised Sherman that he

---

[3] Plaintiff claims that this fact is disputed. Pl. Brf. (Doc. 45) at p. 7. In support of this assertion, Plaintiff states that Chief Brandon told him "it was really not a matter of not being able to accommodate [his] disability by putting [him] on eight-hour shift work at one of the visitor centers/NCIC. But that [Chief Brandon] did not want to set a precedent and have other guards wanting to be transferred there." Regardless of whether Chief Brandon made such a statement, this testimony by Plaintiff does not dispute that the RAC's determination was based on Plaintiff's need for a scheduled meal time. At most, Plaintiff's testimony would support that Chief Brandon was unwilling to disturb the policy of requiring security guards rotate among the twelve- and eight-hour shifts, a position that Defendant has maintained all along.

had fifteen (15) calendar days in which to reply orally, in writing, or both. Sherman did not submit a written response to the proposal.

50.    Sherman applied for disability retirement prior to his final day of employment with the Army. In the statement that Sherman signed under penalty of perjury, he stated that his disability was Type II Diabetes, that he became disabled on July 14, 2015, that he could not "maintain irregular 13 hour shifts," and that "neuropathy" affected his ability to do prolonged standing or walking. He also stated that "I need a constant and regular schedule." Sherman agrees with everything written in this document.

51.    Dr. Gilbert was asked to prepare a letter regarding Sherman's condition in relation to his disability retirement. Dr. Gilbert wrote in his letter that "[i]n my medical opinion, Mr. Sherman is not medically qualified to safely perform the essential functions of a security guard as required by his Position Description at Fort Rucker." He explained that "Mr. Sherman began work at Fort Rucker as a security guard in December 2012. I have evaluated him periodically, at least annually, to assess his ability to perform his job functions. Since he has been hired, I determined on 3 separate occasions that he was medically unqualified to be a Security Guard due to uncontrolled Type II diabetes. First in September 2012 for 3 months, then in March 2014 for several months, and again in April 2015." Dr. Gilbert further explained, "The work hours for Security Guards at Fort Rucker require 12 hour shifts of work on a regular basis. During the time that he was not medically qualified, he worked more of a regular 8 hour work schedule performing other duties and he was able to return his Type II diabetes to a controlled state. During the past 2 and a half years, he has repeatedly shown that he is unable to control his diabetes working the required 12 hour shifts." Sherman testified that he "pretty much" agreed with Dr. Gilbert's statement regarding shift duration and admitted that the letter was "pretty accurate."

52.    On November 16, 2015, CPT Lawson notified Sherman of his decision to sustain the Proposal to Remove. After considering the proposal, Chief Lawson stated in the memorandum that "[c]ontinued employment of an employee who is medically incapable of fully performing the duties of the assigned position is contrary to sound management principals and adversely affects the efficient accomplishment of the mission." If Sherman could not perform the security guard job and no other positions where available for him, then Lawson did not see any other option than termination.

53.    On March 21, 2016, Sherman filed a formal complaint of discrimination. The EEO office listed the date Sherman made initial contact with an

EEO official as December 18, 2015. In his formal complaint, Sherman alleged that he was discriminated against because of his age (62), disability (diabetes) and reprisal for his 2014 and 2015 reasonable accommodation requests when Chief Brandon denied his accommodation request on September 14, 2015, and CPT Lawson terminated his employment.

54.    On November 2, 2016, the Army issued its final agency decision, finding no discrimination.

55.    Sherman has been awarded disability retirement.

## IV.  DISCUSSION

Plaintiff alleges three claims in his Complaint: disability discrimination based on a refusal to accommodate pursuant to the Rehabilitation Act, 29 U.S.C. § 791, *et seq*; age discrimination pursuant to the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.*; and termination of his employment as retaliation for having requested a reasonable accommodation pursuant to the Rehabilitation Act. (Doc. 1, ¶¶ 26, 29, and 32.) Because Plaintiff states that he does not oppose summary judgment on his age discrimination claim, Defendant's motion as to that claim is due to be granted, and the undersigned will analyze only Plaintiff's failure-to-accommodate claim and his retaliation claim.

## A.    Exhaustion of Administrative Remedies

As an initial matter, the undersigned will address Defendant's argument that Plaintiff failed to timely exhaust administrative remedies with respect to his failure-to-accommodate claim. Under the Rehabilitation Act, federal employees are required to initiate administrative review of any alleged discriminatory or retaliatory

conduct with the appropriate agency within forty-five days of the alleged discriminatory act. 29 C.F.R. § 1614.105(a)(1). *See also Shiver v. Chertoff*, 549 F.3d 1342, 1344 (11th Cir. 2000). When the discriminatory act results in a personnel action, the employee must contact an equal employment office (EEO) counselor within 45 days of the effective date of the action. *Shiver*, 549 F.3d at 1344. According to the EEO Commission ("EEOC"), "in order to establish EEO counselor contact, an individual must contact an agency official logically connected to the EEO process and exhibit an intent to begin the EEO process." *Murphree v. Comm'r*, 644 F. App'x 962, 966 (11th Cir. 2016) (quoting *Duke v. Slater,* EEOC Dec. 01A02129, 2000 WL 732027, at *1 (E.E.O.C. May 22, 2000)).

Plaintiff's request for accommodation was denied on September 14, 2015. When Plaintiff filed a formal complaint of discrimination with the EEO office of the Department of the Army on March 21, 2016, he listed the date of initial contact with an EEO official as December 18, 2015, which is more than 45 days after his accommodation request was denied on September 14, 2015. Doc. 44-7, p. 4. Plaintiff amended his first EEO complaint approximately one month later and changed the date of initial contact to June 3, 2015, with first date of contact after the denial of his request for accommodation being September 23, 2015. Doc. 44-7 at p. 8. He referenced phone records that would show that he was in "constant contact" with EEO official Sherie Trone beginning in the summer of 2015. Doc. 44-7, p. 10.

Even though Plaintiff filed an amended complaint with a new date of initial contact, the Department of the Army's letter advising Plaintiff of the claims accepted for investigation identifies the first date of initial contact as December 18, 2015. Def. Brf. at ¶ 53. When Plaintiff filed the Complaint in this case, he attached copies of the phone records referenced in his amended EEO complaint. Doc. 1-1, pp. 9-13. When asked about the date of initial contact in his deposition, Plaintiff testified that he had no reason to file a lawsuit when he made contact in June and that he could not remember if he advised the EEO office that he wanted to file a complaint of discrimination when he made contact on September 23, 2015 Pl. Dep. (Doc. 44-14) at 24:3-25:8.

Plaintiff has offered no explanation or argument for the different dates of initial contact in his summary judgment response. In fact, he does not address Defendant's argument concerning exhaustion of administrative remedies at all in his summary judgment response.  Eleventh Circuit case law holds that, in opposing summary judgment, a party may not rely on pleadings to avoid summary judgment, and the "[t]he onus in on the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Powell v. Am. Remediation & Envtl., Inc.*, 61 F. Supp. 3d 1244, 1252 n.9 (S.D. Ala. 2014), *aff'd,* 618 F. App'x 974 (11th Cir. 2015) (citing *Edmondson v. Bd. Of Tr. of Univ. of Ala.*, 258 F. App'x 250, 253 (11th Cir. 2007), in turn citing *Resolution Trust*

*Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir.1995)).  A party has an obligation to respond to an argument raised in a motion for summary judgment, and failure to respond warrants summary judgment in favor of the opposing party.  *Id.* (citations omitted).

Further, as stated above, although a court must view all evidence in a light most favorable to the non-movant, mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion. *McCormick,* 333 F.3d at 1243; *Ellis,* 432 F.3d at 1326.  The only evidence before the undersigned regarding contact with an EEO counselor consists of the Department of Army's records showing an initial contact date of December 18, 2015; phone records attached to Plaintiff's Complaint but not otherwise explained in his summary judgment response; Plaintiff's testimony stating that he had no reason to file a complaint in June 2015; and his testimony that he cannot recall whether he told the EEO counselor that he wanted to file a complaint on September 23, 2015. Thus, there is no support for a factual allegation that Plaintiff contacted an EEO official and exhibited an intent to begin the EEO process before December 18, 2015.

Accordingly, the undersigned finds that Plaintiff failed to exhaust his administrative remedies on all claims relating to an employment decision by Defendant occurring before November 3, 2015 (45 days before December 18, 2015),

which means Defendant is entitled to a dismissal of Plaintiff's claim based on the September 14, 2015, denial of his request for an accommodation.

## B.     Plaintiff's Failure-to-Accommodate Discrimination Claim

Even though the undersigned finds that Plaintiff's failure-to-accommodate claim is barred as a result of his failure to exhaust administrative remedies, because summary judgment is also proper on other grounds, the undersigned will address the merits of that claim in this Recommendation.  Plaintiff's disability discrimination claim is based on Defendant's denial of his request for an accommodation.  Compl. (Doc. 1), ¶ 26.   The Rehabilitation Act prohibits federal agencies from discriminating in employment against individuals with disabilities. *Shiver*, 549 F. 3d at 1344 (citing *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) and 29 U.S.C. §§ 791(g), 794(a)).   The standard for determining liability under the Rehabilitation Act is the same as that under the ADA, and cases involving the ADA are precedent for those involving the Rehabilitation Act. *Boyle v. City of Pell City*, 866 F.3d 1280, 1288 n.5 (11th Cir. 2017) (citing *Ellis*, 432 F.3d at 1326).

The three-part burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies to claims of discrimination under the Rehabilitation Act that are based on circumstantial evidence. *Center v. Sec'y, Dep't of Homeland Sec., Customs & Border Prot. Agency*, 895 F.3d 1295, 1303 (11th Cir. 2018) (citing *Ellis*, 432 F.3d at 1326).  Under the *McDonnel Douglas* framework, a

plaintiff must first create a presumption of discrimination by establishing a prima facie case. *McDonnel Douglas*, 411 U.S. at 802.  If the plaintiff establishes a prima facie case, then the "burden shifts to the employer to show a legitimate, non-discriminatory reason for its employment action." *Burke-Fowler v. Orange Cty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (citing *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000)). If the employer does so, the burden shifts again to the plaintiff to "prove that the reason provided by the defendant is a pretext for unlawful discrimination." *Id.*

To establish a prima facie case of discrimination, a plaintiff must show that (1) he has a disability, (2) he is otherwise qualified for the position, and (3) he was subjected to unlawful discrimination as a result of his disability. *Boyle,* 866 F.3d at 1288 (citing *Garrett v. Univ. of Ala. at Birmingham Bd. Of Tr.*, 507 F.3d. 1306, 1310 (11th Cir. 2007)).  To show that he was "otherwise qualified" for the position, he must show that he is able to perform the essential functions of the job with or without reasonable accommodation. *Boyle*, 866 F.3d at 1288 (citing *Sch. Bd. Of Nassau Cty. V. Arline*, 480 U.S. 273 (1987)).  If an employee is unable to perform an essential function of his job even with an accommodation, he is not a "qualified individual." *Dickerson v. Sec'y, Dep't of Veterans Affairs Agency*, 489 F. App'x 358, 360 (11th Cir. 2012) (citing *Davis v. Fla. Power & Light Co.,* 205 F.3d 1301, 1305 (11th Cir. 2000)).  An accommodation is reasonable only if it enables the employee to perform

the essential functions of the job, and a plaintiff bears the burden of identifying an accommodation and showing that the accommodation would allow him to perform the essential functions of the job. *Dickerson*, 489 F. App'x at 360 (citing *Lucas v. W.W. Grainger, Inc.,* 257 F.3d 1249, 1255 (11th Cir. 2001) and *Willis v. Conopco, Inc.,* 108 F.3d 282, 283 (11th Cir. 1997)). *See also Boyle*, 866 F.3d at 1289.

If a plaintiff establishes a prima facie case of discrimination, a defendant can remove the presumption of discrimination by providing a legitimate, non-discriminatory reason for its decisions. *See Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010). Once a defendant offers such reasons, a plaintiff can avoid summary judgment only by offering sufficient evidence for a reasonable jury to disbelieve the proffered reasons and conclude they were not what motivated the employer. *See Chapman v. AI Transport*, 229 F.3d 1012, 1025 (11th Cir. 2000); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997). The "inquiry into pretext centers on the employer's beliefs, not the employee's beliefs [or] reality as it exists outside of the decision maker's head." *Alvarez*, 610 F.3d at 1266.  A plaintiff must show "both that the reason was false, and that discrimination was the real reason" for a challenged decision. *Springer v. Convergys Customer Mgmt. Group, Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (citations omitted).

**(1)** **Plaintiff cannot establish a prima face case because he cannot show that he is a qualified individual.**

    **(a)** **Plaintiff's Standing Limitation**

Plaintiff does not dispute that the essential functions of a security job position at Fort Rucker include "[l]ong periods of standing, walking and/or agility, dexterity, and strength to pursue and detain uncooperative persons…."  Def. Brf. (Doc. 43) at ¶ 12; Pl. Brf. (Doc. 45) at p. 1.  Plaintiff also does not dispute that fifty percent of the security guard job encompassed standing gate guard duty, which required standing either twelve hours per shift or eight hours per shift, depending on his rotation and the gate to which he was assigned.  Def. Brf. at ¶ 5 and ¶ 12; and Pl. Brf. at p. 2.  Importantly, Plaintiff has offered no evidence to dispute that Fort Rucker must comply with Army Regulation 525-13, which directs that commanders employ random anti-terrorism measures (RAM) in a way that "portrays a robust, highly visible, and unpredictable security posture … without set pattern, either in terms of measures selected, place, or other variables" or that, to comply with this regulation, security guards at Fort Rucker are not permanently assigned to one gate and one shift. Def. Brf. at ¶¶ 4-5, and Pl. Brf. at p. 1.  Because Plaintiff cannot stand for more than eight hours, a restriction supported by Dr. Gilbert (Doc. 44-7 at p. 48) and evidenced by Plaintiff's accommodation request (Doc. 44-7 at p. 11), Plaintiff's deposition testimony (Pl. Dep., Doc. 44-1, 113:15—114:9,) and Plaintiff's disability

retirement application (Doc. 44-7 at p. 61), it is clear that Plaintiff cannot perform the essential function of standing gate guard duty without accommodation.

Plaintiff argues that his requested accommodation, reassignment to a VCC/NCIC gate, would allow him to perform the essential functions of his security guard job. He made this particular reassignment request because a VCC/NCIC gate is operated with eight-hour shifts. Pl. Dep. at 113:18—114:9. However, a permanent position working at a VCC/NCIC gate does did not exist. *Id.* at 119:13-23. In order to accommodate this request by Plaintiff, Defendant would have had to disregard RAM regulations and create a permanent position at a VCC/NCIC gate especially for Plaintiff. It is well established that an employer is not required to accommodate an employee in any manner that the employee desires and that an employer is not required to create alternative employment opportunities for a disabled person. *Dickerson*, 489 Fed App'x at 360 (citing *Terrell v. USAir,* 132 F.3d 621, 626 (11th Cir. 1998) and *Sutton v. Lader,* 185 F.3d 1203, 1211 (11th Cir. 1999)). Further, a proposed accommodation is not reasonable if there is no vacant position or if it requires an employer to create a new position or reallocate job duties to change the essential job functions of a job. *Boyle,* 866 F.3d at 1289 (citing *Sutton*, 185 F. 3d at 1210-11) and *Dickerson*, 489 Fed App'x at 361 (citing *Lucas*, 257 F.3d at 1256-57 and *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000)). Because reassigning Plaintiff to a VCC/NCIC gate would have required Defendant to create

a new permanent position and change the essential function of the job so that RAM requirements were disregarded, Plaintiff's request was not reasonable.

In his Complaint and in his deposition testimony, Plaintiff also suggested that he could have been reassigned to the RAM duty of performing random vehicle inspections. Compl. ¶ 26; Pl. Dep. at 131:15—134:7. Plaintiff never requested this reassignment before his termination, but, even if he had, the same analysis would apply. Just as with the VCC/NCIC duties, performing random vehicle inspections as part of Fort Rucker's RAM compliance was not a permanent assignment given to one security guard. Pl. Dep. at 134:13-15. RAM duties are rotated with the regular gate control duties in order to keep security at Fort Rucker unpredictable and to keep it from having a discernible, set pattern. *Id.* at 132:18-133:4. Again, Plaintiff does not dispute these facts. Accordingly, because reassigning Plaintiff to permanent RAM duties would have required Defendant to create a new position that did not comply with the Army's RAM requirements, a request for reassignment to specific, limited RAM duties is not reasonable.

The undersigned notes that, despite bearing the burden of showing that a requested accommodation was reasonable, Plaintiff failed to argue that either of the above reassignments was reasonable. *See Dickerson*, F. App'x at 360 (citing *Willis*, 108 F.3d at 283). In fact, Plaintiff's summary judgment response contains only two paragraphs that can be characterized as argument, and he cites no legal authority to

25

support those specific arguments. Pl. Brf. at p. 39-40.  The first paragraph asserts that Plaintiff could perform the essential functions of his job because (1) he was hired with an A1C of 8.4, (2) Dr. Gilbert's removal from full duty was arbitrary and discriminatory, and (3) there were no incidents in which he failed to perform the essential functions of his job except when he was removed from full duty by Dr. Gilbert. That issue is addressed herein. The second paragraph of argument by Plaintiff states that Defendant discriminated   because Plaintiff's request for accommodation was not evaluated consistent with federal law in that (1) Dr. Gilbert's meal-time restriction was considered instead of Plaintiff's request to be reassigned to NCIC; (2) Chief Brandon did not consider whether Dr. Gilbert's recommendations could be implemented; and (3) and the panel did not consider whether Dr. Gilbert's restrictions would create a hardship.  However, as discussed above, Plaintiff's requested reassignment was not reasonable. An employer has no duty to engage in the "interactive process" or show undue hardship when an employee fails to identify a reasonable accommodation. *Bagwell v. Morgan Cty. Comm'n*, 676 F. App'x 863, 867 (11th Cir. 2017) (citing *Earl*, 207 F.3d at 1367).

### (b)    Plaintiff's Meal-Time Restriction

In addition to being restricted from standing more than eight hours in one shift, which keeps Plaintiff from performing the essential functions of the security job position, Plaintiff also has the medical restriction of requiring meals at the same

time every day in order to keep his diabetes under control. Dr. Gilbert, who reviews employees' medical records when an employee makes a request for accommodation, reviewed records from Plaintiff's general practitioner, nephrologist, and cardiologist. Def. Brf. ¶ 43, 45; Pl. Brf. at p. 6. Dr. Gilbert had been monitoring Plaintiff's A1C levels since his employment began and was familiar with Plaintiff's difficulty in controlling his A1C levels when he worked full-duty as a security guard. Dr. Gilbert participated in the meeting to determine if Defendant could accommodate Plaintiff, and he informed the reasonable accommodation committee that Plaintiff required a regular and consistent schedule and that he absolutely had to have a set meal period every day. Def. Brf. at ¶¶ 47-48; Pl. Brf. at p. 6.

Plaintiff does not dispute that set meal times are not allowed while working the security guard position. Def. Brf. at ¶ 6; Pl. Brf. at p. 1. Instead, he insists that he does not need set meal times, that he did not request set meal times, and that Defendant acted in a discriminatory manner by following Dr. Gilbert's recommendation. Pl. Brf. at p. 29, 40; Pl. Dep. at 126:17-21. However, when Plaintiff's A1C was 9.4 as tested by his personal physician in July 2014, that physician provided him with information instructing him to eat meals and snacks at the same time every day. Def. Brf. at ¶ 35. Dr. Gilbert testified that a diabetic with poorly managed diabetes as shown by high A1C levels has a greater danger of dehydration, which can decrease mental abilities and reduce ability to respond (Def.

Brf. at ¶ 17), and Plaintiff has provided no medical evidence disputing Dr. Gilbert's testimony or his determination that Plaintiff required set meal times.

Plaintiff's A1C levels are at issue in this lawsuit because of AR 190-56, which states:

> Diabetes Mellitus could interfere with the performance of essential police and guard functions…. The examinee's blood glucose should have been under excellent control for an extended period of time and glycosylated hemoglobin should be less than 8.0. The examinee should have … no end organ damage (nephropathy, neuropathy….)

*Id.*   This regulation further states that a security guard must "maintain mental alertness" and is required to "have the functional ability to respond appropriately to routine and emergency situations" in order to perform the essential security guard duties. *Id.* Plaintiff has not made a disparate impact claim or challenged this regulation anywhere in his Complaint or his summary judgment response. He has merely states that being hired with an A1C of 8.4 and performing his job "without fail," except when he was removed from full duty by Dr. Gilbert, proves that he can perform the essential functions of the job.  Pl. Brf. at p. 39-40.  However, the issue is not whether Plaintiff was able to perform the essential functions of his job when he was working full duty. The issue is whether Plaintiff can perform the essential functions of the job with restrictions against standing more than eight hours and requiring a set schedule of meal times.

With respect to Plaintiff's initial A1C level, Dr. Gilbert testified that he cleared Plaintiff for hire because he did not want to "hold this [test] against him, so to speak, and [he was] pretty sure that [Plaintiff could] get it down…."  Gilbert Dep. 164:15-21.  Dr. Gilbert wanted to give Plaintiff a chance to bring his A1C level down, and he planned to monitor Plaintiff's A1C levels quarterly.  *Id.* at ¶ 18. Plaintiff was tested again approximately two months after hire, and his A1C was 7.6. *Id.* at ¶ 19.  He remained on full duty until his A1C levels rose again, at which point Dr. Gilbert found him medically unqualified to perform the essential functions of his job, including carrying a weapon and standing gate guard duty.  *Id.* at ¶¶ 20-21.

Dr. Gilbert tested Plaintiff's A1C many times after he was hired, and Dr. Gilbert removed Plaintiff from full duty each time he examined Plaintiff following A1C test results that exceeded 8.0.  In December 2014 and January 2015, Dr. Gilbert tested Plaintiff's A1C, and it was above 9.0 each time.  *Id.* at ¶¶ 36-37.  Dr. Gilbert had Plaintiff tested again in March 2015 in preparation for Plaintiff's annual exam, and Plaintiff's A1C was 8.8.  *Id.* at ¶ 38.  When Plaintiff met with Dr. Gilbert in April 2015 for his annual exam, Dr. Gilbert removed him from full duty. *Id.* at ¶ 39. The parties have offered no explanation as to why Dr. Gilbert did not meet with Plaintiff sooner following the December 2014 or January 2015 test results, but Dr. Gilbert testified that there could have been a lack of coordination between his office and the security guard staff when scheduling Plaintiff's bloodwork. (Gilbert Dep.

113:11—115:19.)  Plaintiff has offered no evidence to dispute this explanation or to show that Dr. Gilbert cleared Plaintiff to work full duty after any examination that followed a high A1C result.  Further, Dr. Gilbert's failure to enforce the Army regulation at the time of hiring so Plaintiff could bring his A1C down, or the fact that there was a lack of coordination in ordering A1C tests or scheduling examinations with Plaintiff, does not obligate Defendant to continue allowing Plaintiff to work full duty with A1C levels that exceed AR 190-56.  When an employer provides a greater accommodation than required by the Rehabilitation Act, "it incurs no legal obligation to continue doing so."  *See Boyle*, 866 F.3d at 1289-90 (quoting *Lucas*, 257 F.3d at 1257 n.3).

Accordingly, because of Plaintiff's restriction on standing more than eight hours and his meal-time restriction that is necessary in order to control his A1C level, and further because Plaintiff has failed to show that his requested accommodations were reasonable, the undersigned finds that Plaintiff has failed to show that he is a qualified individual and, thus, cannot establish a prima facie case of discrimination based on a failure to accommodate.

## (2)   Defendant has articulated legitimate, nondiscriminatory reasons for its decision, and Plaintiff has not shown pretext.

Finally, even if the Plaintiff could establish a prima face case of discrimination based on Defendant's failure to accommodate, his claim would still fail because he cannot show that Defendant's articulated legitimate, non-discriminatory reason for

its denial of his request for accommodation was pretext. Defendant's articulated reasons for denying Plaintiff's request for accommodation are that Plaintiff was unable to safely perform the essential functions of his security guard position based on his high A1C levels, as determined by Dr. Gilbert; that Defendant could not accommodate Plaintiff's limitation on standing or the restriction concerning set meal times without creating a new position for him; and there were no other vacant positions on Fort Rucker for which Plaintiff was qualified. The sole inquiry at the pretext stage is whether the employer gave an honest explanation for its actions. *See Alvarez*, 610 F.3d at 1266. It follows that a plaintiff cannot recast the employer's reason or question the wisdom behind it but must meet the reason head on and show it is false. *See Chapman*, 229 F.3d at 1030. Plaintiff has produced no evidence showing a material dispute of fact as to whether the decision makers relied on Dr. Gilbert's medical opinion in determining the restrictions that would allow Plaintiff to control his diabetes and handle security guard duties. Thus, Plaintiff has put forth no evidence that Defendant's articulated reasons are false and pretext for discrimination. Indeed, Plaintiff does not dispute that his A1C levels consistently exceeded the 8.0 limit of AR 190-56, that his requested reassignment would have required Defendant to create a new position that contravened RAM requirements, that Dr. Gilbert believed Plaintiff's medical restrictions were necessary for him to perform the essential functions of his job, or that the decision makers relied on Dr.

Gilbert's medical recommendations in determining that they could not accommodate Plaintiff. As such, Plaintiff's failure to "meet [Defendant's] reason head on and rebut it," rather than simply quarreling with it, is fatal to his claim. *See Chapman*, 226 F.3d at 1030. Accordingly, even if Plaintiff established a prima facie case of discrimination, the undersigned recommends granting summary judgment on Plaintiff's failure-to-accommodate claim because Plaintiff cannot establish that the Defendant's stated reasons for its decision were pretext.

## C.    Plaintiff's Retaliation Claim

Plaintiff alleges in his Complaint that he was terminated in retaliation for having requested an accommodation for his disability. Unlike his age discrimination claim, Plaintiff did not explicitly dismiss his retaliation claim in his summary judgment response. However, Plaintiff failed to address Defendant's arguments as to why summary judgment should be granted on the retaliation claim. Indeed, Plaintiff's response contains no reference whatsoever to his retaliation claim, and the only references to his termination are found in the "Facts" section, where he identifies the number of co-workers with NCIC certification at the time of termination (Doc. 45 at p. 26) and the number of VCC gates being maintained when Plaintiff was terminated (Doc. 45 at p. 27).

As outlined above with respect to Plaintiff's failure to respond to Defendant's argument concerning exhaustion of administrative remedies, a court is not required

to parse a summary judgment record to search out facts or evidence not brought to its attention. A party may not rely simply on his pleadings to avoid summary judgment. *Edmondson*, 258 F. App'x at 253. Rather, the parties bear the burden of formulating arguments, and claims alleged in the complaint but not relied upon in summary judgment are deemed abandoned. *Id.* (citing *Resolution Trust*, 43 F.3d at 599). Although a district court must ensure that summary judgment is appropriate against a party that files no response at all, where the non-moving party responds to summary judgment but fails to address a particular argument asserted in the summary judgment motion, the court may properly consider the non-movant's default as intentional and treat the claim as abandoned. *Powell*, 61 F. Supp. 3d at 1255 n.9. Because Plaintiff filed a summary judgment response but failed to address Defendant's arguments concerning Plaintiff's retaliation claim, the undersigned finds that Plaintiff has abandoned that claim.

Finally, the undersigned finds that, even if Plaintiff had not abandoned the retaliation claim, Defendant would still be entitled to summary judgment. The retaliation claim relies on the same evidentiary basis as the discrimination claim. Although Plaintiff bases his retaliation claim on his termination rather than the failure to accommodate, his termination resulted from Defendant's inability to accommodate Plaintiff's restrictions and find a vacant position for which he was qualified. Also, Defendant's articulated legitimate, nondiscriminatory reasons for

the termination are the same as its reasons for denying Plaintiff's request for accommodation, and Plaintiff cannot show that the reasons were pretext. Thus, the retaliation claim is a "mere recloth[ing]" of Plaintiff's disability discrimination claim, warranting summary judgment for the same reasons that summary judgment is appropriate on the failure-to-accommodate discrimination claim. *See Lucas,* 257 F.3d 1249, 1261 (11th Cir. 2001) ("this contention merely reclothes [plaintiff's] ADA discrimination claim, which we have already rejected, and it fares no better in this garb.")  As such, even if the claim had not been abandoned by Plaintiff, Defendant is nonetheless entitled to summary judgment.

## V.  CONCLUSION

For all of the foregoing reasons, the undersigned concludes that Defendant is entitled to summary judgment on Plaintiff's claims of disability discrimination, age discrimination, and retaliation.  Accordingly, it is the RECOMMENDATION of the Magistrate Judge that Defendant's Motion for Summary Judgment (Doc. No. 42) be GRANTED.

It is further

ORDERED that the parties shall file any objections to this Recommendation or before April 10, 2019.  A party must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made; frivolous, conclusive, or general objections will not be considered.  Failure to file written

objections to the Magistrate Judge's findings and recommendations under 28 U.S.C. § 636(b)(1) will bar a party from a *de novo* determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11th Cir. R. 3-1. *See Stein v. Lanning Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).

DONE this 27th day of March, 2019.

/s/ Wallace Capel, Jr.
CHIEF UNITED STATES MAGISTRATE JUDGE